UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

| | |
|---|---|
| **ANTHONY CAMARCA,** | **CIVIL NO. 2:22-CV-128-KKC-CJS** |
| **Plaintiff,** | |
| **V.** | **OPINION & ORDER** |
| **CITY OF COVINGTON,** *d/b/a* **Covington Police Department, et al.,** | |
| **Defendants.** | |

*** *** ***

The matter is before the Court on the defendants' motion to exclude and motion for summary judgment. (DEs 37, 38.)

## I.    Factual Background

This case arises from an interaction between the plaintiff, Anthony Camarca, and certain members of the Covington Police Department on October 17, 2021, at the Marriott Hotel in Covington, Kentucky. Camarca and his wife, Sara, were staying at the hotel that evening following Sara's brother's wedding and subsequent reception. Other members of the wedding party also had rooms booked at the hotel that evening. After several hours of attending wedding events and continuing celebrations at a local bar, the wedding party, including Camarca and Sara, found themselves hanging out in the hotel's lobby. The wedding party remained there from around 2:00 a.m. to 3:30 a.m. (when officers arrived on the scene). Based on all accounts, the entire wedding party was heavily intoxicated.

Shortly before 3:30 a.m., while the group was still in the lobby, Sara and her sister (also a member of the wedding party) got into a physical altercation. This caught the

attention of the hotel clerk, who promptly called 911 to report the incident and the increasingly unruly wedding party.

The Covington Police Department was dispatched to the hotel in response. Officer Ross Woodward was the first to arrive, followed by Sergeant Michael Gilliland and officers Robert Christen, Bradley Morris, and Samuel Matthews. A flurry of events and statements followed, each of which was captured by various sources of video footage.[1] The altercation between police officers and the wedding party resulted in several arrests, including Camarca's and Sara's, and extensive injuries to Camarca's right leg. This lawsuit followed, with Camarca suing the City of Covington and the individual officers under 42 U.S.C § 1983 for a litany of alleged constitutional violations.

## II.    Standard of Review

A district court will grant summary judgment when the moving party shows there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party carries this burden, the burden of production shifts to the nonmoving party to "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322.

At the summary judgment stage, the Court does not weigh the evidence and determine the truth of the matter. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Rather, in most cases, the Court

---

[1] So as not to beat the proverbial dead horse (or in this case, perhaps the fabled unicorn is a more appropriate idiom) (DE 48, Woodward BWC at 3:33:34), this opinion describes the events only where pertinent.

views the facts in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But where police videos "depict[ ] all of the genuinely disputed facts," *Standifer v. Lacon,* 587 Fed.Appx. 919, 920 (6th Cir. 2014), the Court "view[s] the facts in the light depicted by the videotape[s]." *Scott,* 550 U.S. at 381. The Court does, however, fill in gaps in the videos in the nonmoving party's favor. *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015). Ultimately, this Court determines whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52.

### III.    Analysis

#### a.    Camarca's § 1983 claims against the individual officers (Count II)

In Count II, Camarca asserts a § 1983 claim against the defendant officers, in their individual capacities, alleging the following constitutional violations: (1) unlawful detention and arrest in violation of the Fourth Amendment; (2) excessive use of force in violation of the Fourth Amendment; (3) denial of the right to counsel (without reference to where this right was derived from); and (4) denial of the right to equal protection and due process of law in violation of the Fourteenth Amendment. At the outset, the Court notes that only Officers Woodward and Christen were physically involved in Camarca's arrest. Thus, while Camarca pursues a direct liability theory against Officers Woodward and Christen, he pursues only an indirect liability theory against Officers Morris, Matthews, and Gilliland—arguing that the latter officers had a duty to intervene in Woodward's and Christen's unconstitutional conduct. For the following reasons, the Court finds that the defendant officers are entitled to summary judgment on all claims brought in Count II.

#### i.    Unlawful detention and arrest

Camarca alleges that officers Woodward and Christen, in detaining and arresting him, subjected him to an unreasonable seizure in contravention of the Fourth Amendment.

3

To prevail on a § 1983 unlawful detention claim, a plaintiff must establish that there was no reasonable suspicion for his detention. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). "[R]easonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011). To prevail on a § 1983 unlawful arrest claim, a plaintiff must establish that there was no probable cause for his arrest. *Buttino v. City of Hamtramck*, 87 Fed. Appx. 499, 502 (6th Cir. 2004). "'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. McClain*, 444 F.3d 556, 562 (6th Cir.2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir.1993) (en banc)).

In making the reasonable suspicion and probable cause determinations, the Court first looks to define the precise moment in which Camarca was detained and then arrested. A person is "detained" when "a reasonable person would have believed that [he was] not free to walk away." *United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir. 1983). "A person is arrested when an officer, by means of physical force or show of authority, terminates or restrains [a suspect's] freedom of movement.'" *Alexander v. Carter for Byrd*, 733 F. App'x 256, 267 (6th Cir. 2018) (cleaned up). Here, both officers' body camera footage and the parties' recitation of events confirm the following sequence of events:

- **First**, Officer Woodward enters the hotel lobby at 3:33:29 a.m.;

- **Second**, Officer Woodward instructs everyone in the wedding party, except Sara, that they need to return to their rooms at 3:33:53 a.m.;

- **Third**, Camarca objects to Officer Woodward's instruction and attempts to remove Sara from the hotel lobby. Camarca's efforts to remove Sara continue despite Officer Woodward's repeated instruction that Sara was not free to leave. This occurs between 3:34:08–3:34:19 a.m.;

- **Fourth**, seconds later, Officer Woodward instructs Camarca that he is also not free to leave. This instruction is given at 3:34:21 a.m. and is then repeated;

4

- **Fifth**, despite Officer Woodward's instruction, which Camarca later acknowledged hearing and understanding, he continues to attempt to remove both himself and Sara from the lobby, saying "I am free to leave," while grabbing Sara's arm and directing her away from the lobby; and

- **Sixth**, Officer Woodward immediately thereafter wraps his arms around Camarca, intending to arrest him, at 3:34:24 a.m. Officer Christen subsequently assists in effectuating the arrest.

This sequence of events confirms that Camarca was detained only after Officer Woodward's instruction at 3:34:21 a.m.[2] and that he was arrested thereafter when Officer Woodward used force to restrain his movement. So, the relevant question becomes: did the officers have reasonable suspicion to initially detain Camarca and probable cause to place him under arrest moments later? For the following reasons, the answer is yes.

In this case, Officer Woodward was dispatched to respond to a fight at the hotel. Upon arriving, Officer Woodward identified Sara as a potential assailant. Officer Woodward, however, received resistance from Camarca when he attempted to make contact with Sara. As detailed above, Camarca insisted that he was taking Sara to their room and away from Officer Woodward's investigation despite repeated instructions that Sara was not free to leave. At one point, Camarca even physically grabbed Sara in an effort to remove her. Under Kentucky law, it is a crime to "intentionally obstruct[], impair[] or hinder[] the performance of a governmental function by using or threatening to use violence, force or physical interference." KRS 519.020. Under these facts, Officer Woodward not only had reasonable suspicion to believe that Camarca was intentionally obstructing his investigation by using physical interference, but he also had probable cause to believe that Camarca was doing so. Officer Woodward's first-hand observation of Camarca's conduct alone was sufficient to

---

[2] This moment reflects the earliest a reasonable person in Camarca's shoes would have felt as though they were not free to leave. *See Saperstein*, 723 F.2d at 1225.

establish probable cause. *See United States v. Boyd*, 735 F. App'x 202, 205 (6th Cir. 2018) ("The officers' first-hand observations of the drug sale established probable cause that [the defendant's] apartment contained drugs....").

Alternatively, Officer Woodward also had reasonable suspicion and probable cause to believe that Camarca was committing the crime of public intoxication. Under Kentucky law, it is a crime to "appear[] in a public place manifestly under the influence of alcohol to the degree that [one] may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity." KRS 222.202(1). Here, as a matter of law, Camarca was in a public place at the time of his arrest. KRS 525.010(3) (including hotel lobbies within the definition of "public place"). And Officer Woodward had several indicators which revealed that Camarca was "manifestly" intoxicated and a potential danger, including information received from the dispatcher about the wedding parties' level of intoxication, Camarca's slurred speech, and the degree of aggression Camarca displayed toward Officer Woodward.

Based on the foregoing, the Court finds that reasonable suspicion and probable cause existed to justify Camarca's detention and arrest, and no genuine dispute of material fact exists as to these issues. As such, officers Woodward and Christen are entitled to summary judgment as to Camarca's unlawful detention and arrest claims brought in Count II.

### ii.    Excessive force

Camarca also claims in Count II that officers Woodward and Christen subjected him to excessive force in contravention of the Fourth Amendment.

"The Fourth Amendment's guarantee against unreasonable seizures encompasses a protection against use of excessive, or unreasonable, force 'in the context of an arrest or investigatory stop.'" *King v. City of Rockford, Michigan*, 97 F.4th 379, 393 (6th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). "The reasonableness of a use of force is assessed from the perspective of a reasonable officer on the scene without the benefit of

'20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97). "This inquiry entails consideration of the totality of the circumstances, including, but not limited to: (1) 'the severity of the crime at issue;' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others;' and (3) whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). The demeanor of the suspect and whether he was "intoxicated and noncompliant," are also relevant factors, while the "extent of the injury inflicted" is not a crucial factor. *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008); *Miller v. Sanilac Cty.*, 606 F.3d 240, 252 (6th Cir. 2010). The Court may decide whether an officer acted reasonably as a matter of law, but only if "all material facts are undisputed." *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013).

"In interactions involving multiple uses of force, like here, [the Court] 'analyze[es] the subject event in segments' to assess the reasonableness of an officer's actions." *King*, 97 F.4th at 393 (quoting *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020)). Here, the Court delineates between the following force-segments: (1) Officer Woodward shoving Camarca against a wall; (2) officers Woodward and Christen taking Camarca to the ground and placing him under arrest; (3) Officer Woodward releasing his grip on Camarca as he fell; and (4) the officers forcing Camarca to hop on his non-injured leg while exiting the hotel.[3]

### 1. Shoving

Beginning then with the reasonableness of Officer Woodward's conduct during the first segment. "[V]iolently shoving a defendant against a wall or other such structure while arresting him has consistently been held by the Sixth Circuit to be an unlawful use of force, absent circumstances such as flight, general unruliness, or danger on the part of the

---

[3] The parties do not delineate between these segments. Camarca's complaint and supporting memorandum, however, make allegations regarding multiple uses of force. Circuit precedent is clear that in such cases the Court must analyze the subject event in appropriate segments.

arrestee." *Jones v. Montgomery*, No. 15-1142, 2016 WL 320992, at *5 (W.D. Tenn. Jan. 25, 2016) (collecting cases).

Here, when the shove occurred, Officer Woodward knew Camarca was intoxicated[4], Camarca had openly defied Officer Woodward's lawful commands, Camarca had exhibited an increasingly aggressive tone and demeanor, and he had attempted to obstruct Officer Woodward's investigation. These facts are not disputed.[5] Moreover, Camarca concedes that he was verbally hostile and confrontational with Officer Woodward, making statements before the initial contact such as "you piece of shit," and "you can suck a dick." (DE 41, Camarca Depo., at 81.) Additionally, Camarca can be seen in Officer Woodward's body camera footage making a physical advance towards Officer Woodward before the initial contact—an advance menacing enough that a fellow group-member placed a hand on Camarca's chest to impede his progress. (DE 48, Woodward BWC at 33:34:14–3:34:17.)

Under the first *Graham* factor, it is true that Camarca was not suspected of a serious or violent offense.[6] But on these facts, the second and third *Graham* factors, as well as the totality of the circumstances, counsel that shoving Camarca against a wall was objectively reasonable. *See Lockett v. Donnellon*, 38 F. App'x 289, 291–92 (6th Cir. 2002) (finding no excessive force when officers pushed and pulled plaintiff into police car in a rough manner where suspect was uncooperative and verbally abusive). For the second *Graham* factor, it is true that "mere agitated hand gestures and profanity, unaccompanied by threats, fall short of the prototypical behavior that would make an officer fear for his physical safety." *Shumate*

---

[4] *See Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007) ("heavy intoxication create[es] a volatile situation . . . [d]runk persons are generally unpredictable.").

[5] *See* DE 41, Camarca Depo., at 73–74, 81 (Camarca testifying that *it was* his intention to remove Sara from the lobby and that he knew he was defying Officer Woodward's order that neither he nor Sara were free to leave).

[6] Camarca was suspected of obstructing an official investigation and public intoxication.

*v. City of Adrian*, 44 F.4th 427, 442 (6th Cir. 2022) (cleaned up). Here, however, Camarca's
agitated gestures and profanity were accompanied by a threat—though not a verbal threat—
in the form of Camarca's menacing advance towards Officer Woodward. Thus, a reasonable
officer at this scene would have easily concluded that Camarca posed a safety threat. And for
the third *Graham* factor, a reasonable officer would also have perceived Camarca's conduct
as an overt attempt to flee (and aid another in fleeing) from an investigation. Accordingly,
the Court finds that Officer Woodward acted reasonably as a matter of law and that no
genuine dispute of material fact exists with respect to this segment.

### 2. Takedown and arrest

Turning now to the second segment of force in this case. This segment consists of
officers Woodward's and Christen's takedown of Camarca along with the force used in placing
him under arrest. Video evidence does not clearly demonstrate *why* Camarca was taken to
the ground. Officer Woodward contends that he and Camarca lost balance during their
struggle, sending the two to the floor. In contrast, Camarca alleges that Officer Woodward
simply tackled him to the ground. The Court resolves the gap in video evidence in Camarca's
favor. *Rudlaff*, 791 F.3d at 639.

Even taking Camarca's version of events as true, the evidence is still so one-sided as
to entitle the defendants to summary judgment on this claim. No matter how the takedown
event is parsed out, the video evidence clearly shows that Camarca was actively resisting the
officers by this point. "Active resistance 'can be characterized by physical force, a show of
force, or verbal hostility coupled with failure to comply with police orders.'" *King*, 97 F.4th at
393 (citation omitted); *see also Browning v. Edmonson Cnty., Kentucky*, 18 F.4th 516, 527
(6th Cir. 2021) ("[A]ctive resistance generally means: physical struggles with police, threats
toward officers, refusal or resistance to being handcuffed, and erratic or irrational
behavior."). The Sixth Circuit has "deemed tasers, knee strikes, and other force necessary to

9

subdue suspects justified where the suspects repeatedly refused to comply and physically resisted arrest." *King*, 97 F.4th at 396.

Here, moments before the takedown, Camarca can be seen in the body camera footage locking up his body to avoid being detained while simultaneously reaching toward Officer Christen's neck or upper chest area. (DE 48, Christen BWC at 3:34:25.) He can also be heard calling Officer Woodward "a fucking piece of shit," "a faggot," and "a fucking cocksucker." (DE 41, Camarca Depo., at 78.) And to exasperate the officers' struggle in subduing Camarca, Sara can also be seen entering the fray in an effort to free Camarca from Officer Woodward's hold. (DE 48, Christen BWC at 3:34:25) (showing Sara reaching towards Officer Woodward's left shoulder.) After the takedown, body camera footage clearly demonstrates that Camarca continued resisting by grabbing at the officers' arms and repeatedly stating that he would "beat [the officers'] ass[es]." (*Id.* at 3:34:26–3:34:44.)

On facts like these, law enforcement officers have wide latitude in employing the force necessary to gain control over such uncooperative, verbally hostile, and physically resistive individuals. *See e.g.*, *Rudlaff*, 791 F.3d at 641–44 (finding use of a taser and knee strike to subdue an individual to be reasonable where individual was verbally defiant, swung his arms toward an officer, and locked up his body to avoid being handcuffed). Accordingly, based on clear video evidence, the Court finds that the takedown and subsequent force used to effectuate Camarca's arrest were objectively reasonable.

Moreover, the particular *degree* of force used in effectuating the takedown and arrest was objectively reasonable. Relative to the circumstances present here, Officers Woodward and Christen took Camarca to the ground and placed him under arrest in a nonviolent manner. There was no "slamming" nor intentional "pain compliance holds" involved. Rather, Camarca was taken down in a standard fashion and was then handcuffed by having his arms forcefully placed behind his back. This is the sort of minimal degree of force approved by

10

courts frequently rather than the sort of excessive degree of force found to be constitutionally repugnant. *Compare VanPelt v. City of Detroit, Michigan*, 70 F.4th 338, 340 (6th Cir. 2023) (describing officer's tackle as a "moderate use of force [which] was a reasonable tactic to impede VanPelt's flight,"), *with* Phelps v. Coy, 286 F.3d 295, 298, 302 (6th Cir. 2002) (constitutional violation found where officers tackled plaintiff, hit him, and slammed his head into the floor three times), *and Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991) (force deemed excessive where police tackled suspect and put him in a "pain compliance hold.").

The only pause taken by the Court in reaching its conclusion is the fact that the challenged use of force during this segment resulted in extensive injuries to Camarca's leg. Ultimately, however, the severity of Camarca's injuries does not change the outcome. For one, as described above, the "extent of the injury inflicted" is not a crucial factor in the excessive force calculus. *Miller*, 606 F.3d at 252. And for two, Camarca presents no evidence that any other use of force, besides that which the Court found to be objectively reasonable, was applied to cause those extensive injuries. As such, the Court finds that the particular *degree* of force Officers Woodward and Christen used in effectuating the takedown and arrest was objectively reasonable as a matter of law and that no genuine dispute of material fact exists with respect to this segment.

### 3. Releasing grip

Moving on to the third segment of force in this case, involving Officer Woodward picking Camarca up off the floor after he was handcuffed and subsequently releasing his grip once Camarca began to fall.

Camarca argues that "[w]hen [he] was unable to stand because of his broken leg, Officer Woodward shoved him head first into the wall and to the tile floor." (DE 56 at 21.) The video evidence does not support this allegation and flatly contradicts it. Officer Christen's body camera footage clearly captured this interaction. (DE 48, Christen BWC at 3:35:35–

3:35:40.) This footage shows Officer Woodward, who was standing to the left of Camarca, grabbing Camarca under his left arm to assist him to his feet. Then, while coming to his feet, Camarca repeatedly exclaims "you broke my leg," and begins to stumble and fall to his right, away from Officer Woodward's hold. With Camarca's weight taking him to the ground, the video footage shows Officer Woodward lose his grip as Camarca falls. At no point does Officer Woodward "shove[ ] [Camarca] head first into the wall[.]" (DE 56 at 21.) Accordingly, because the Court "view[s] the facts in the light depicted by the videotape," it finds no genuine dispute of material fact exists with respect to this segment. *Scott*, 550 U.S. at 381. Moreover, the Court concludes that Officer Woodward's conduct was objectively reasonable as a matter of law. *See VanPelt*, 70 F.4th at 341 (finding no excessive force where officer released his grip as a handcuffed arrestee fell to the ground while exclaiming "[Y]ou broke my f—ing hip.").

### 4. Escorting

Finally, the Court takes up the final segment of force at issue, which involved officers Woodward and Christen escorting Camarca out of the hotel. Camarca claims that this conduct constituted excessive force because the officers forced him to walk, or hop, on a broken leg. The video evidence, however, clearly depicts Camarca hopping out of the lobby on his *non-injured leg*, with Officers Woodward and Christen on each side assisting him.

Camarca's claim that the officers forced him to hop on a non-injured leg does not fit cleanly into an excessive force claim. It is axiomatic to an excessive force claim that some level of force was actually applied and that some physical injury resulted. *See generally Rodriguez v. Passinault*, 637 F.3d 675, 687 (6th Cir. 2011) ("under the Fourth Amendment's reasonableness standard, excessive force claims generally require at least *de minimis* physical injury."). During this segment, unlike in a typical excessive force claim, there was no application of force. And Camarca makes no allegation that being forced to hop on his non-broken leg exasperated his then-existing injuries. Thus, it is clear that Camarca

cannot point to an application of force or injury suffered during this segment which would support an **excessive force** claim. This finding does not render such conduct immune from any constitutional claim. For example, arrestees who suffer injuries they feel are ignored by arresting officers could pursue a Fourteenth Amendment deliberate indifference claim. *E.g.*, *Gross v. City of Dearborn Heights*, 625 F. App'x 747, 753 (6th Cir. 2015). However, no such claim was asserted here, and without evidence of an application of force by the officers, Camarca has failed to show a genuine issue of material fact that the officers are liable for **excessive force** for forcing him to hop on a non-injured leg.

To summarize, the Court finds that the applications of force during each segment were objectively reasonable as a matter of law, there being no genuine dispute of material fact. *Stricker*, 710 F.3d at 364.

### iii.    Right to counsel

Camarca initially alleged in Count II that officers deprived him of his constitutionally protected right to counsel, in violation of § 1983. (DE 1 at 8.) Camarca has since, however, conceded that "he did not have a constitutional right to counsel at the time of his detention and arrest[.]" (DE 56 at 23.) Accordingly, the defendant officers are entitled to summary judgment on Camarca's claim in Count II that he was deprived of his right to counsel.

### iv.    Equal protection

Camarca also alleges in Count II that officers deprived him of "the right to equal protection and due process of law." (DE 1 at 8.) To prove an equal protection claim, the plaintiff must demonstrate (1) that the government treated him "disparately as compared to similarly situated persons," and (2) "that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011) (citation omitted).

13

Here, the defendants point to the absence of evidence demonstrating that Camarca was treated disparately when compared to other similarly situated persons. This is sufficient to carry the defendants' initial burden at the summary judgment stage. *Celotex Corp.*, 477 U.S. at 323–325. And this proves fatal to Camarca's claim, as he fails to respond with the production of any contrary evidence. In his response, Camarca never explicitly addresses the lack of "disparate treatment" evidence. Instead, he merely alleges that, "[s]urely, the Defendant police officers do not treat all individuals the way Mr. Camarca was treated!!" (DE 56 at 24.) Without more, no genuine dispute of material fact exists as to this claim, and the defendants are entitled to judgment as a matter of law.

### v.    Duty to intervene

Camarca also alleges in Count II, as previously mentioned, that Sergeant Gilliland and officers Morris and Matthews had a duty to intervene in officers Woodward's and Christen's unconstitutional conduct. Generally, "officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights." *Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001). Here, however, Officers Woodward and Christen did not violate Camarca's constitutional rights. Accordingly, Sergeant Gilliland and officers Morris and Matthews had no duty to intervene, and they are similarly entitled to summary judgment on Count II. *See e.g.*, *Harris v. Hofbauer*, 229 F.3d 1152 (6th Cir. 2000).

### vi.    Qualified immunity

Notwithstanding, even if Camarca were able to establish that the officers violated his constitutional rights, the officers would be entitled to qualified immunity if those rights were not clearly established at the time of the violation. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Even so, a plaintiff need not identify a case with the exact same fact pattern or even "fundamentally similar" or

14

"materially similar" facts. *Id*. Rather, "the salient question ... is whether the state of the law ... gave [the defendants] fair warning that their alleged treatment of [a plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Here, Camarca fails to demonstrate that the state of the law gave any of the officers fair warning that their alleged treatment of him was unconstitutional. In his response, Camarca argues only that it was clearly established at the time that "the use of excessive or inappropriate force in detaining and arresting a person is absolutely prohibited." (DE 56 at 18) (failing to address the issue of qualified immunity for any claim except his excessive force claim.) Camarca, however, cannot rely on the general right to be free from excessive force; instead, there must be some more specific right—one that was clearly established as of October 17, 2021—that the defendants violated. *Wysong v. City of Heath*, 260 F. App'x 848, 854 (6th Cir. 2008) ("The Supreme Court emphasized that it is not enough for a right to be 'clearly established' as a general proposition; it must be 'clearly established' in the 'more particularized, relevant sense' of the "specific context of the case,") (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Accordingly, the officers are entitled to qualified immunity with respect to Camarca's claims alleged in Count II.

### b. Camarca's § 1983 claims against the City (Counts I and III)

In Count I, Camarca asserts a § 1983 claim against the City for a number of alleged constitutional deprivations. In Count III, Camarca asserts a § 1983 claim against each of the defendant officers, in their official capacities, alleging the same constitutional deprivations. However, because claims against municipal officials in their official capacities are claims against that municipality, Count III is, in fact, a claim against the City. *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015). Thus, the Court addresses Counts I and III together.

"A municipality may not be held liable under § 1983 on a respondeat superior theory— in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378,

388–89 (6th Cir. 2014) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). Rather, "a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *Id.* at 387 (quoting *Monell*, 436 U.S. at 692). Here, Camarca identifies no "official policy" adopted by the City which could be said to have caused the allegedly unconstitutional conduct. Rather, based on his response to the defendants' motion for summary judgment, Camarca seems to pursue a "failure to train" theory of municipality liability available under *Monell* and its progeny. (DE 56 at 22–23.)

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To succeed on this theory, Camarca must show that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Here, the City carries its initial burden of demonstrating that no genuine issue of material fact exists by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 323–325 (internal quotation marks omitted). For the following reasons, the Court finds that Camarca fails to carry his reciprocal burden to establish a genuine dispute of material fact.

16

Under prong one, Camarca cites no evidence demonstrating that any defendant officer received inadequate training. His response to the City's motion consists of only conclusory statements to the effect that the defendant officers did not have adequate "use of force" training. No accompanying citations to evidence are provided. (DE 56 at 23.) In fact, the only discussion of evidence relating to police training in Camarca's response acknowledges testimony from the defendant officers that they "were trained regarding," the City's policy manual. (*Id.* at 19.) Moreover, under prong two, Camarca cites no evidence demonstrating the "deliberate indifference" of the City. (*Id.*) Even Camarca's conclusory allegations fall short of demonstrating deliberate indifference. He claims neither that the City ignored prior instances of unconstitutional conduct nor that the City failed to equip the defendant officers "with specific tools to handle recurring situations." *See Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 287 (6th Cir. 2020) (discussing the two ways to demonstrate deliberate indifference). The same result follows for prong three, as Camarca fails to address how the inadequacy of police training here was "closely related to or caused," his injuries.

Put plainly, the glaring hole in Camarca's position against the City is the inability to cite any evidence demonstrating inadequate police training. In his response, Camarca's argument never ventures beyond the realm of unsupported, conclusory allegations and into the realm of the sort of contrary evidence he needed to produce to survive a motion for summary judgment. *See Sigmon v. Appalachian Coal Properties, Inc.*, 400 F. App'x 43, 49 (6th Cir. 2010) ("[U]nsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment,") (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)). As such, the City is entitled to summary judgment on Counts I and III.

### c.  Camarca's remaining state law claims (Count IV, V, and VI)

Camarca alleges state law claims for assault and battery against Officers Woodward and Christen (Count IV), intentional infliction of emotional distress against all defendants (Count V), and punitive damages against all defendants (Counts VI). For the following reasons, the respective defendants are entitled to summary judgment on each of these counts.

First, Officers Woodward and Christen are entitled to summary judgment on Count IV. Kentucky law permits an officer making an arrest to use force as necessary to make that arrest. KRS 503.090. The Sixth Circuit has held that KRS 503.090 permits only the use of "'less than excessive'" force. *Browning*, 18 F.4th at 531 (quoting *Brown v. Fournier*, No. 2015-CA-001429-MR, 2017 WL 2391709, at *4 (Ky. App. June 2, 2017)). Here, because there is no genuine dispute of material fact as to whether officers Woodward and Christen used "less than excessive" force, *supra* Section III(a)(ii), they are entitled to judgment on Count IV.

Next, all defendants are entitled to summary judgment on Camarca's intentional infliction of emotional distress ("IIED") claim. Under Kentucky law, an IIED claim is barred in cases where the factual basis for a plaintiff's claim, if proven, would rise to any other "traditional" tort for which emotional damages can be recovered. *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993). Here, if the facts that form the basis for Camarca's IIED claim could be proven, those facts would give rise to other traditional torts, such as assault, battery, or false imprisonment. And emotional damages are recoverable for those more traditional torts. *See Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. Ct. App. 2001). Accordingly, the Court finds that Camarca is barred under Kentucky law from pursuing this IIED claim. As such, the defendants are entitled to summary judgment on Count V.

Finally, the defendants are entitled to summary judgment on Count VI. A claim for punitive damages is not a separate cause of action but is rather a remedy potentially available to litigants. *Smith v. Westlake Vinyls, Inc.*, 403 F. Supp. 3d 625, 635–36 (W.D. Ky.

2019). Thus, the defendants are entitled to summary judgment on Count VI insofar as Camarca brings that count as an independent cause of action.

**IV.    Motion to exclude expert testimony**

Also pending is defendants' motion to exclude the testimony of Camarca's expert. (DE 37.) Based on the foregoing, however, the Court has found that the defendants are entitled to summary judgment as to each of Camarca's claims. Accordingly, because there is no subject matter remaining for Camarca's expert to opine on, the motion to exclude is denied as moot.

**V.    Conclusion**

For the foregoing reasons, the Court hereby ORDERS that

(1)  the defendants' motion for summary judgment (DE 38) is GRANTED; and

(2)  the defendants' motion to exclude (DE 37) is DENIED as moot.

This 16th day of April, 2025.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY